UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| MOROCCANOIL, INC, <br><br> Plaintiff, <br><br> v. <br><br> TONY CONFORTI, *et al.* <br><br> Defendants. | Civ. No. 11-136 (KM)(MAH) <br><br> **OPINION** |

**<u>KEVIN MCNULTY, U.S.D.J.</u>:**

On December 30, 2020, the Hon. Michael A. Hammer, Magistrate Judge, granted the motion (DE 251)[1] of defendants Tony Conforti ("Conforti") and Salon Distribution, Inc. ("SDI") (collectively "defendants") to substitute Conforti Holdings, Ltd. ("CHL II") for SDI. (DE 280; MJ Oral Opinion at 20.) Plaintiff Moroccanoil, Inc. ("Moroccanoil") now appeals (DE 306) that determination.

For the reasons provided herein, I will deny the appeal and affirm Judge Hammer's Order (DE 280).

---

[1] Citations to the record will be abbreviated as follows. Citations to page numbers refer to the page numbers assigned through the Electronic Court Filing system, unless otherwise indicated:

"DE" = Docket entry number in this case.

"MJ Oral Opinion" = Transcript of the December 30, 2020 Opinion by the Hon. Michael A. Hammer, United States Magistrate Judge (DE 282)

"App. Br." = Brief in Support of Plaintiff's Appeal of Judge Hammer's Order (DE 306-2)

"Opp. Br." = Brief in Opposition to Plaintiff's Appeal of Judge Hammer's Order (DE 311)

"Reply" = Reply in Further Support of Plaintiff's Appeal of Judge Hammer's Order (DE 312).

1

## I. Summary

### a. Statement of Facts and Procedural History

This litigation has been ongoing for over a decade. As the Court writes primarily for the benefit of the parties, I recite only the facts pertinent to resolution of this appeal.

On January 7, 2011, Moroccanoil initiated a trademark infringement action against defendants. (DE 1.) In July 2013, Moroccanoil, Conforti, and SDI entered into a Settlement Agreement and, on September 12, 2013, I so-ordered the parties' stipulation and order of dismissal with prejudice. (DE 104.) Under the terms of the Settlement Agreement, SDI was required to obtain a bond (the "Settlement Bond") in its own name to secure the settlement and any breach of the Agreement. (DE 252-1, Certification of Mark C. Riedel, Esq. ("Riedel Cert.") ¶5.) In November 2014, the Settlement Bond was issued in the names of SDI and Tony Conforti. (DE 252-1, Exhibit 1 to Riedel Cert.) The Court retained jurisdiction to enforce the terms of the Settlement Agreement. (DE 104.)

On March 31, 2013, prior to the Settlement Agreement but unbeknownst to Moroccanoil, SDI amalgamated with Conforti Holdings Ltd. ("CHL I") to form CHL II under Canadian law. (DE 251-3, Exhibit A.)

On April 28, 2015, Moroccanoil filed a motion (DE 107) to enforce the Settlement Agreement, which defendants opposed and to which they filed a cross-motion (DE 118). On March 30, 2016, I denied both motions and ordered the parties to confer with Judge Hammer and establish a discovery schedule. (DE 124.) Thereafter the parties engaged in discovery.

In September 2019, defendants served an expert report prepared by RSM Canada Consulting, LP (the "RSM Report") which disclosed the amalgamation of CHL I and SDI for the first time. Indeed, Judge Hammer found that "it was really not until September 2019 that Defendants disclosed to [Moroccanoil] the amalgamation and existence of CHL II." (MJ Oral Opinion at 3-4.)

On July 24, 2020, defendants filed a motion (DE 251) to substitute CHL II for SDI, which Moroccanoil opposed (DE 252.) As explained in more detail, *infra,* on December 30, 2020, Judge Hammer granted the substitution motion

and resolved other discovery disputes not presently before the Court. (*See generally* MJ Oral Opinion.) Moroccanoil filed a motion (DE 283) to reconsider the December 30 Order with respect to the substitution decision, which Judge Hammer denied on March 23, 2021. (DE 301.) Moroccanoil now appeals (DE 306) Judge Hammer's Order (DE 280) granting defendants' substitution motion.

### b. Judge Hammer's December 30, 2020 Decision and Order

Judge Hammer granted defendants' motion to substitute CHL II for SDI pursuant to Federal Rule of Civil Procedure 25(c) for the following reasons. (DE 280; MJ Oral Opinion at 20.)

First, Judge Hammer rejected Moroccanoil's proposal to add CHL II as an additional defendant and its proposal to stay defendants' claims until its claims have been resolved. (MJ Oral Opinion at 11-12.) Judge Hammer noted that (1) Moroccanoil improperly sought affirmative relief without filing a motion or cross-motion and (2) it offered no caselaw to supports its contention that, despite the amalgamation, CHL II lacks standing. (*Id.* at 12.) Further, Judge Hammer found no benefit in staying a case that is over nine years old and is well into discovery. (*Id.*) Additionally, "Moroccanoil's claims and Defendants' counterclaims are inextricable intertwined such that resolution of one invariably will impact the resolution of the other." (*Id.*)

Next, Judge Hammer found that, under Canadian law, CHL II stepped into the shoes of SDI after the amalgamation. (*Id.* at 15-17.) Thus, as defendants acknowledged, CHL II remains liable to prosecution and is subject to any orders or judgments for or against SDI. (*Id.* at 17.) In other words, Judge Hammer accepted defendants' contention that "CHL [II] is SDI, and the entities are one and the same." (*Id.* (internal quotation marks omitted) (quoting defendants' reply brief in further support of their motion to substitute (DE 254 at 3).)

Finally, Judge Hammer found that, although defendants belatedly informed Moroccanoil of the amalgamation, Moroccanoil "fail[ed] to identify any

3

material prejudice resulting from allowing substitution at this stage." (*Id.* at 18.) Judge Hammer reasoned that: (1) "substitution does not affect Moroccanoil's right of recovery against Defendants" because "CHL II has assumed all of the assets and liabilities of SDI, and is subject to any rules, orders, or judgments entered against SDI"; and (2) Moroccanoil "has been afforded ample discovery specific to the amalgamation since its disclosure." (*Id.* at 18.) Thus, although Judge Hammer agreed with Moroccanoil "that the disclosure was long overdue," he identified "no litigation advantage that Defendants gained from the belated disclosure, nor any prejudice that Plaintiff has suffered." (*Id.* at 20.) Therefore, Judge Hammer granted defendants' motion to substitute under Rule 25 (c). (*Id.*)

## II. Discussion

### a. Legal Standard

The District Court will reverse a Magistrate Judge's decision on a non-dispositive motion only if it is "clearly erroneous or contrary to law." Fed. R. Civ. P. 72(a); L. Civ. R. 72.1(c)(1)(A). This Court has frequently spoken of the discretion granted to the Magistrate Judge in non-dispositive matters. Where the appeal seeks review of a matter within the core competence of the Magistrate Judge, such as a discovery dispute, an abuse of discretion standard is appropriate. *See Cooper Hospital/Univ. Med. Ctr. v. Sullivan*, 183 F.R.D. 119, 127 (D.N.J. 1998*); Deluccia v. City of Paterson,* No. 09-703, 2012 WL 909548, at *1 (D.N.J. March 15, 2012). "This deferential standard is especially appropriate where the Magistrate Judge has managed this case from the outset and developed a thorough knowledge of the proceedings." *Lithuanian Commerce Corp., Ltd. v. Sara Lee Hosiery*, 177 F.R.D. 205, 214 (D.N.J. 1997) (internal quotations omitted); *see Deluccia*, 2012 WL 909548, at *1 (same). Abuse of discretion review, of course, may get us to much the same place: as a practical matter it incorporates plenary review of legal questions. *See Koon v. United States*, 518 U.S. 81, 100 (1996); *Doe v. Hartford Life & Acc. Ins. Co.*, 237 F.R.D.

545, 548 (D.N.J. 2006) ("[A] magistrate judge's legal conclusions on a non-dispositive motion will be reviewed de novo.").[2]

### b. Substitution Under Rule 25 (c)

Rule 25(c) provides that "[i]f an interest is transferred, the action may be continued by or against the original party unless the court, on motion, orders the transferee to be substituted in the action or joined with the original party." Fed. R. Civ. P. 25(c). The United States Court of Appeals for the Third Circuit has explained a transfer of interest in the corporate setting:

> A "transfer of interest" in a corporate context occurs when one corporation becomes the successor to another by merger or other acquisition of the interest the original corporate party had in the lawsuit. *See Froning's, Inc. v. Johnston Feed Service, Inc.*, 568 F.2d 108, 110 (8th Cir.1978) (assignment of claims); *DeVilliers v. Atlas Corp.*, 360 F.2d 292, 297 (10th Cir.1966) (merger); *Hazeltine Corp. v. Kirkpatrick*, 165 F.2d 683, 685–86 (3d Cir.1948) (transfer of patents).
>
> Rule 25(c) "does not require that anything be done after an interest has been transferred." *See* 7C Wright, Miller & Kane, Federal Civil Procedure (hereinafter "Wright & Miller") § 1958 at 555 (2d ed. 1986). When a defendant corporation has merged with another corporation, for example, the case may be continued against the original defendant and the judgment will be binding on the successor even if the successor is not named in the lawsuit. *See id.*; *see also Froning's*, 568 F.2d at 110. Although substitution is usually effected during the course of litigation, substitution has been upheld even after litigation has ended as long as the transfer of interest occurred during the pendency of the case. *See, e.g., Bamerilease Capital Corp. v. Nearburg*, 958 F.2d 150, 153–54 (6th Cir.1992) (affirming substitution in the context of proceeding to enforce a settlement agreement); *Arnold Graphics Industries, Inc. v. Independent Agent Center, Inc.*, 775 F.2d 38, 40 (2d Cir.1985) (affirming district court's substitution of successor corporation for original defendant after entry of judgment).

---

[2]  Defendants submit that, because the decision to allow substitution of a party under Rule 25(c) is discretionary, the appropriate standard of review is abuse of discretion. (Opp. Brief at 13-14.) However, as explained, the abuse of discretion standard incorporates plenary review of legal conclusions. Thus, where, as here, a party seeks review of a Magistrate Judge's legal conclusion (*i.e.* review of Judge Hammer's application of Rule 25(c)), the district court engages in *de novo* review.

*Luxliner P.L. Exp., Co. v. RDI/Luxliner, Inc.*, 13 F.3d 69, 71 (3d Cir. 1993).[3]

The decision to join or substitute a party under Rule 25(c) is generally left to the district court's discretion because such joinder or substitutional "does not ordinarily alter the substantive rights of parties but is merely a procedural device designed to facilitate the conduct of a case." *Id.* at 71-71; *see also Abraxis BioScience, Inc. v. Navinta LLC,* No. 07-1251, 2009 WL 904043, at *5 (D.N.J. Mar. 30, 2009) ("A joinder or substitution under Rule 25 is appropriate when a district court, in the exercise of its discretion, finds that such joinder or substitution would facilitate the conduct of a case.").

In sum, in the context of a transfer of interest, a court must make a choice:

> [It] may direct the transferee to be either substituted in the action or joined with the original party. Thus, the court must make a determination, based on the respective rights and liabilities among the parties and the transferee under the substantive law governing the case, whether it would best facilitate the conduct of the case to have the transferor remain in the case, substitute the transferee, or join the transferee and continue with both as parties.

6 Moore's Federal Practice - Civil § 25.34 (2021).

### c. Judge Hammer's Application of Rule 25(c)

Moroccanoil argues that Judge Hammer misapplied Rule 25(c) in substituting CHL II for SDI, rather than joining the former as an additional party, for three reasons. (App. Br. at 13-20.) I will address each in turn.

> *i. Alleged uncertainty regarding the relationship among SDI, CHL II, the Settlement Agreement, and the Settlement Bond.*

First, Moroccanoil contends that "where there is uncertainty about the nature of the interest transferred, the court should *join* the new party, and leave the old party in the litigation." (*Id.* at 13.) Moroccanoil submits that, here, substitution creates uncertainties about: (1) the relationship between SDI and

---

[3] As Judge Hammer noted, at issue in *Luxliner* was the due process rights of the successor corporation. (MJ Oral Opinion at 3); *Luxliner,* 13 F.3d at 72-73. Thus, the facts in *Luxliner* are not analogous to the situation presented here.

CHL II; (2) the amalgamation's effect on the Settlement Agreement (of which SDI was a party, not CHL II) and the Settlement Bond; and (3) the impact substitution would have on this litigation and the substantive legal rights of the parties. (*Id.*) Plaintiff relies primarily on two cases: *Mars, Inc. v. JCM Am. Corp.*, No. 05-3165, 2007 WL 776786 (D.N.J. Mar. 9, 2007) and *Eastman Chemical Company v. Alphabet Inc.*, No. 9-971, 2011 WL 13054223 (D. Del. Dec. 9, 2011).

In *Mars*, the plaintiff, Mars, Inc. ("Mars"), initiated a patent infringement action against the two defendants. 2007 WL 776786 at *1. During the pendency of the litigation, Mars filed a motion to substitute the entity MEI, Inc. ("MEI") for itself, alleging that it had "transferred 'the entire, right, title, and interest in and to the patents-in-suit' to MEI." *Id.* The court, however, denied Mars' motion because the "record provided by the parties d[id] not clearly indicate . . . whether Mars, MEI, or a third party presently own[ed] the rights and interests in the patents-in-suit." *Id.* at 2. Thus, the court found it would be inappropriate to substitute MEI for Mars given "the uncertainty over the rights and interests in the patents-in-suit." However, "[i]n an effort to assure that the proper parties [were] named," the Court "exercis[ed] its discretion to join MEI as a party plaintiff with Mars pursuant to Rule 25(c)." *Id.*

In *Eastman*, the plaintiff Eastman Chemical Company ("Eastman") filed a complaint against defendants asserting patent infringement and other related claims. 2011 WL 13054223 at *1. During the pendency of the action, Eastman allegedly assigned the patents-in-suit to Grupo Petrotemex, S.A. de C.V. ("Petrotemex") and DAK Americas LLC ("DAK") and moved to substitute them as plaintiffs. *Id.* The court, however, found that Eastman failed to provide sufficient evidence "that *all* of its interests relating to th[e] litigation ha[d] been transferred." *Id.* at *3. While it appeared that the interests related to the patents-in-suit were transferred, there was uncertainty about the interests involved in Eastman's breach of contract and trade secret misappropriation claims, which were premised on a Technology License Agreement ("TLA")

executed by Eastman and certain defendants. *Id.* at *1-3 ("It appears from the record that Eastman has assigned its entire right, title, and interest in the patents-in-suit to Petrotemex. However, although both the breach of contract and trade secret misappropriation claims are intimately related to the TLA, Eastman does not appear to have assigned its interest in the TLA to either Petrotemex or DAK.") (internal citations omitted). Thus, the court found that Eastman may have "continue[d] to bear the burdens and reap the benefits of the TLA" which made it clear that Eastman may still have an interest in the litigation. *Id.* at *3. Because there was "uncertainty regarding the nature and extent of the alleged transfers of interest from a named party to a third party," the court found that joiner was more appropriate than substitution. *Id.* at *4.

Moroccanoil submits that, as in *Mars* and *Eastman*, the uncertainty about the nature of the rights transferred between SDI and CHL II renders substitution improper. (App. Br. at 15.) Further, Moroccanoil disputes that SDI and CHL II are essentially the same entity. Instead, it contends that "SDI and CHL [II] were, and possibly still are, different entities, and their transfer of interest is completely uncertain." (*Id.* at 17.)

Defendants respond that *Mars* and *Eastman* are inapposite because those cases did not concern a complete statutory amalgamation of entities, like that which occurred here, but instead involved a limited assignment of patent rights. (Opp. Br. at 19.) Here, defendants contend, the rights of SDI, CHL II, and Moroccan after the amalgamation are clear as a matter of Canadian law:

> [I]n light of the Ontario Ministry of Government Service's certification of the Articles of Amalgamation consolidating the entities, and the plain terms of the Settlement Agreement, CHL II holds all causes of action, claims, and liabilities, and is liable to prosecution and subject to convictions, rules, orders, or judgments entered for or against SDI and/or old CHL.

(*Id.*) Regarding the Settlement Agreement, defendants point to the following comprehensive language transferring all liabilities:

> each Party, each Party's affiliates, and each Party's affiliates' present and future subsidiaries, divisions, parents, successors,

8

assignees, licensees, transferees, executors, trustees, receivers, conservators or administrators ... , including any entity surviving out of any merger (in any form), acquisition or reorganizations, and including all persons or entities receiving any benefits, rights, obligations or liabilities of this Agreement by its terms or by operation of law . . . .

(Opp. Br. at 9 (citing DE 107-5 at 112).)

Defendants have the better argument. As explained, Judge Hammer found that CHL II "stepped into the shoes" of SDI after the amalgamation. (MJ Oral Opinion at 14.) Judge Hammer relied on the Ontario Business Corporations Act, R.S.O. 1990, c. B. 16, § 179, which provides in pertinent part:

> Upon the articles of amalgamation becoming effective,
> . . .
> (b) the amalgamated corporation possesses all the property, rights, privileges and franchises and is subject to all liabilities, including civil, criminal and quasi-criminal, and all contracts, disabilities and debts of each of the amalgamating corporations;
>
> (c) a conviction against, or ruling, order or judgment in favour or against an amalgamating corporation may be enforced by or against the amalgamated corporation;
> . . .
> (e) the amalgamated corporation shall be deemed to be the party plaintiff or the party defendant, as the case may be, in any civil action commenced by or against an amalgamating corporation before the amalgamation has become effective.

Judge Hammer found that "the Articles of Amalgamation submitted to, and certified by, the Ontario Ministry of Government on March 31, 2013 clearly establish that the amalgamation that resulted in the formation of CHL II was completed pursuant to the Ontario Provincial Business Corporations Act." (MJ Oral Opinion at 17); (*see also* DE 251-3, Exhibit A.) Because "§ 179 mandates that the amalgamated corporation steps into the shoes of the amalgamating corporations, and assumes all of their assets, liabilities, and obligations," Judge Hammer concluded that, "under Ontario law, an action commenced

9

against the amalgamating corporation [*i.e.*, SDI] continues against the amalgamated corporation [*i.e.*, CHL II]". (MJ Oral Opinion at 17.)

In finding that SDI and CHL II were essentially the same entity, Judge Hammer relied, in part, on the reasoning in *Brinkley v. Monterey Financial Services, Inc.*, No. 16-1103, 2018 WL 3618054 (S.D. Cal. 2018). (MJ Oral Opinion at 15-17.) In *Brinkley*, the plaintiff initiated a state court action against Monterey Financial Services Inc. ("Old Monterey"). 2018 WL 3618054 at*1. During the pendency of the litigation, "Old Monterey underwent a voluntary statutory conversion from a California corporation to a limited liability company." That conversion resulted in the company's name being changed from Monterey Financial Services Inc. to Monterey Financial Services LLC ("New Monterey"). *Id.* The district court found that, as a result of that conversion, "Old Monterey dissolved by operation of California law, ceased to exist as a legal entity, all of its assets and liabilities transferred to New Monterey, and New Monterey stepped into its shoes for all purposes." *Id.* Although Old Monterey "no longer exist[ed] by operation of California law" plaintiff continued to insist that it provide its own discovery responses, separate from those responses of New Monterey. *Id.* Plaintiff refused to accept New Monterey's discovery responses on behalf of Old Monterey even though New Monterey explained that the responses would be identical. *Id.* Because "Old Monterey no longer exist[ed] and [wa]s 'essentially' a non-entity that lack[ed] assets, employees, or officers who could respond to discovery on its behalf," the court granted the motion to substitute Old Monterey for New Monterey.[4] *Id.*

---

[4] The *Brinkley* Court explained the legal consequences when a corporation converts to an LLC under California law:
> [A] corporation seeking to become a limited liability company must complete a statement of conversion on the new entity's article of organization. § 1155(a)(3). The California Secretary of State has created and designated Form LLC-1A as the form corporations must file to do this. http://www.sos.ca.gov/business-programs/business-entities/conversion-information/ (listing different conversion certificates based on type of entity being converted) (last visited July 10, 2018). The

Moroccanoil submits that *Brinkley* is not analogous to the present matter because SDI and CHL II were two separate entities and, thus, this is not a situation where a single entity converted to a different form. (App. Br at 16-18). According to Moroccanoil, substitution in this situation affects the substantive rights of the parties for three reasons. First, per the RSM Report, defendants claim damages on behalf of the "Conforti Group," which comprises different salons from those that would have been owned by SDI at the time of the Settlement Agreement. (*Id.* at 17.) Therefore, substitution would allow CHL II "to assert damages on behalf of those salons which were not part of SDI's July 2013 Agreement but which arise solely from CHL [II] or the 'Conforti Group.'" (*Id.*) In other words, substitution "potentially open[s] the door to new damages not contemplated by the Agreement." (*Id.*)

---

filing of Form LLC-1A has several immediate and automatic consequences.

First, the corporation is immediately dissolved and the LLC springs forth in its place. § 1155(d) ("The filing with the Secretary of State of a statement of conversion on an organizational document or a certificate of conversion … shall have the effect of the filing of a certificate of dissolution by the converting corporation and no converting corporation that has made the filing is required to file" the certificates of dissolution otherwise required.). As a result of this automatic dissolution, "the corporate powers, rights, and privileges of the [converting] corporation shall cease." § 1905(b).

This statutory conversion also automatically causes the immediate transfer of all legal rights, assets, and liabilities to the newly-formed LLC. Specifically, the following vest or transfer to the LLC: all real and personal rights and property, § 1158(b)(1); all debts, liabilities, and obligations, § 1158(b)(2); and all rights and liens of creditors and lienholders, § 1158(b)(3).

Finally, "[a]n entity that converts into another entity … is for all purposes … the same entity that existed before the conversion." § 1158(a). That being said, although the corporation ceases to exist as a legal entity, "[a]ny action or proceeding pending … against the … converting corporation may be continued against the … converted corporation as if the conversion had not occurred." § 1158(c).

2018 WL 3618054 at *2–3.

Moroccanoil's argument is unavailing for two reasons. First, as Judge Hammer noted, Moroccanoil was afforded ample discovery after learning about the amalgamation:

> Moroccanoil has been afforded ample discovery specific to the amalgamation since its disclosure in the RSM Report. In the wake of Defendant's belated disclosure of the amalgamation, the Court has permitted Plaintiff to take extensive discovery focused specifically on the amalgamation. Order, November 1, 2019, D.E. 216. According to the Defendants, Plaintiff sought, and Defendants produced, more than 80,000 pages of financial information and corporate records and Plaintiff was afforded the opportunity to depose or redepose relevant witnesses.

(MJ Oral Opinion at 18.) Therefore, Moroccanoil was on notice of all salons owned by Conforti and CHL II at least as early as September 2019. Second, whether CHL II can assert damages on behalf of salons not contemplated by the Settlement Agreement is an issue of contract interpretation to be addressed upon resolution of parties' competing motions in connection with the settlement. Thus, I find that the issue of potential new damages, however it may ultimately be resolved, does not affect the question of substitution.

Moroccanoil also submits that, in granting substitution, Judge Hammer "essentially amended the Agreement and imposed additional and conflicting settlement obligations on Moroccanoil that were never bargained-for by the parties." (*Id.* at 18.) Again, that issue, if it is one, is something to be explored on the motions to enforce the Settlement Agreement. Moreover, under Canadian law, CHL II assumed all duties and responsibilities of SDI. Therefore, CHL II is subject to the Settlement Agreement to the same extent as SDI.[5]

---

[5] Moroccanoil points out that SDI, a supposedly non-existent entity, entered into the Settlement Agreement *before* amalgamation. It also notes that Judge Hammer, in his recitation of the facts, indicated the amalgamation occurred after settlement. (App. Br. at 9 n.3.) However, in his Oral Opinion, Judge Hammer stated the correct dates: that settlement occurred in July 2013 and the amalgamation occurred in March 2013. (MJ Oral Opinion at 3.) Thus, contrary to Moroccanoil's assertion, Judge Hammer did not determine the issues "based on an incorrect understanding that SDI was still a valid legal entity when the Agreement was signed, or that CHL succeeded to the interests of SDI subsequent to the Agreement under the terms of the Agreement." (App. Br at 9 n.3.) As Judge Hammer noted, the belated disclosure of the

Finally, Moroccanoil submits that substitution raises uncertainties regarding the Settlement Bond. (*Id.*) However, Judge Hammer directly addressed this issue and found that it did not constitute a valid reason to deny substitution, for two reasons:

> First, as noted above, it appears that the bond was amended in December 2014, whereby CHL II secured an irrevocable standby letter of credit. Second, nothing in the record suggests any cognizable risk that were an amendment to the bond still necessary, CHL II would be unable to procure it particularly given that CHL II also holds all of the assets and claims of SDI.

(MJ Oral Opinion at 19.) For those reasons, there is no uncertainty regarding the status of the bond.

In its reply, Moroccanoil further argues that there is uncertainty because "SDI was a non-existent legal entity with no power to contract at the time the Agreement was signed in its name, despite warranting that it had the full power and authority to enter the Agreement." (Reply at 8.) Further, it contends that the assignment clause in the Settlement Agreement is unhelpful because it contemplates *present and future* affiliates, rather than past affiliates. (*Id.*) These concerns, however, do not warrant denial of substitution because defendants acknowledge CHL II's obligations under the agreement, and will be held to that acknowledgement. (*See* Opp. at 25.)

For the reasons articulated above, I find that there is no "uncertainty" regarding the relationship between the parties and the effect of substitution on the Settlement Agreement or the Settlement Bond. By operation of Ontario law, CHL II stepped into the shoes and assumed all obligations of SDI. Thus, CHL II is bound by the Agreement to the same extent as SDI. And, as explained, the Settlement Bond was amended to incorporate CHL II's irrevocable standby letter of credit. Therefore, Moroccanoil's uncertainty arguments are unavailing.

---

amalgamation is not unproblematic. However, defendants acknowledge CHL II's responsibilities under the Settlement Agreement. (Opp. Br at 23-24.) And, as explained, under Canadian law, the amalgamated corporation (CHL II) assumes all obligations of the amalgamating corporation (SDI).

### ii. *Substitution and the ends of justice*

Next, Moroccanoil submits that substituting CHL II in place of SDI does not serve the ends of justice. (App. Br. at 18-19.) In particular, Moroccanoil submits that substitution should not be permitted under principles of equity given defendants' failure to disclose the amalgamation. (App. Br. at 19.) Again, however, Judge Hammer acknowledged that defendants "could have done considerably more to clarify the amalgamation and formation of CHL II." (MH Oral Opinion at 17-18.) However, as Judge Hammer noted, "substitution does not affect Moroccanoil's right of recovery" because "CHL II has assumed all of the assets and liability of SDI." (*Id.* at 18.) Further, extensive discovery was permitted after Moroccanoil learned of the amalgamation in 2019. (*Id.*) At this point, nearly two years later, the delay alone does not warrant denial of defendants' substitution motion.

### iii. *The Court's ability to order joinder*

Finally, regarding Judge Hammer's application of Rule 25(c), Moroccanoil submits that a court can order joinder without an affirmative application. (App. Br at 19-20.) Moroccanoil is correct, as a technical matter, that a district court, in exercising its discretion, is permitted to order joinder rather than substitution under Rule 25(c). *See, e.g., Mars*, 2007 WL 776786 at *2 ("In an effort to assure that the proper parties are named in this case, this Court is exercising its discretion to join MEI as a party plaintiff with Mars pursuant to Rule 25(c)."); *Eastman*, 2011 WL 13054223 at *6 ("Because Eastman's interest in the patents-in-suit appears to have been transferred and because joinder will result in more efficient facilitation of this litigation than would substitution, the Court finds that Petrotemex and DAK should be joined, not substituted, as plaintiffs in this matter.").

Nevertheless, for the reasons explained *supra*, Judge Hammer did not commit any error in exercising his discretion to order substitution. Because CHL II stepped into the shoes of SDI, and assumed all assets and liabilities, and is subject to any rules, orders, or judgments entered against SDI,

substitution does not create uncertainty and does not affect Moroccanoil's substantive rights.

### d. Alleged Prejudice to Moroccanoil

Moroccanoil also contends that Judge Hammer erred in determining that it would not be prejudiced by substitution. (App. Br. at 20-21.) In this regard, Moroccanoil relies on its brief in support of its motion for reconsideration of Judge Hammer's December 30 Order. In particular, though, Moroccanoil notes that Judger Hammer indicated that the amalgamation occurred after the Settlement Agreement. That point has been addressed. *See* n.5, *supra.* Moroccanoil also contends that *Brinkley* was misapplied because this matter involves amalgamation of two separate entities and not the conversion of one entity into a different form. That point, too, has been addressed. *See*, *supra* Section II.c.i.

In any event, Judge Hammer thoroughly and accurately addressed the issue of prejudice in his December 30 decision and on reconsideration:

> Moroccanoil has failed to identify any material prejudice resulting from allowing substitution at this stage. First, as noted above, substitution does not affect Moroccanoil's right of recovery against Defendants. CHL II has assumed all of the assets and liabilities of SDI, and is subject to any rules, orders, or judgments entered against SDI. Second, Moroccanoil has been afforded ample discovery specific to the amalgamation since its disclosure in the RSM Report. In the wake of Defendant's belated disclosure of the amalgamation, the Court has permitted Plaintiff to take extensive discovery focused specifically on the amalgamation.

(MJ Oral Opinion at 18)

> Plaintiff rehashes the same or substantially similar arguments concerning prejudice that the Court considered in granting Defendants' substitution motion. However, the Court carefully considered the issue of prejudice, and articulated several reasons why Plaintiff would not suffer undue prejudice if the Court granted substitution. The Court examined relevant caselaw and the

15

extensive additional discovery afforded to Plaintiff in concluding
that any delay was not sufficient to warrant denial of the motion.

(DE 301 at 3 n.2 (internal citations omitted).)

At base, Moroccanoil fears that substitution will inhibit its ability to recover against SDI's assets. It argues in its Reply as follows:

> Defendants glaringly fail to provide any facts to rebut Moroccanoil's citations showing that SDI has continued to operate independently long after the amalgamation purportedly caused SDI to cease to exist. Besides conducting this litigation in its own name, undisputed evidence shows that SDI continued transacting business throughout the relevant period as SDI. In fact, all of the transactions, invoices, orders, product shipments, and party communications in performance of the Agreement occurred in the name of SDI. This all makes perfect sense, as SDI was operating as a separate business. SDI had its own bank account, its own employees, and probably still has assets in its name to this day. These assets should be available to Moroccanoil for any recovery against Defendants. Substitution allows SDI to be free of any judgment against it for its breach of the Agreement it signed.[6]

(Reply at 9.) However, as Judge Hammer found, CHL II assumes *all* assets of SDI by operation of Canadian law. (MJ Oral Opinion at 18); Ontario Business Corporations Act, R.S.O. 1990, c. B. 16, § 179(b) ("the amalgamated corporation possesses all the property, rights, privileges and franchises and is subject to all liabilities, including civil, criminal and quasi-criminal, and all contracts, disabilities and debts of each of the amalgamating corporations."). Like Judge Hammer, I find that Moroccanoil will not be prejudiced by substitution because, under Canadian law, CHL II assumes all liabilities of SDI.

### III. Conclusion

For the reasons set forth above, I will deny Moroccanoil's' appeal (DE 306) and affirm Judge Hammer's Order (DE 280) substituting CHL II for SDI.

---

[6] Moroccanoil also submits that it can produce 250 pages of CHL II's financial statements demonstrating the separate and continuing business operations of SDI. However, because the statements are marked "attorneys' eyes only," Moroccanoil would be forced to file another motion to seal. (Reply at 9 n.2.)

16

An appropriate order follows.

Dated: June 4, 2021

/s/ Kevin McNulty

**Kevin McNulty**
**United States District Judge**